## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 24 2017, 6:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeffrey E. Kimmell
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Henry A. Flores, Jr.
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jason Hershberger,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 24, 2017

Court of Appeals Case No.
71A03-1702-CR-320

Appeal from the St. Joseph
Superior Court

The Honorable Jane Woodward
Miller, Judge

Trial Court Cause No.
71D01-1508-F1-8

**Najam, Judge.**

# Statement of the Case

Jason Hershberger appeals his convictions for six counts of child molesting, five as Level 1 felonies and one as a Class A felony, following a jury trial. Hershberger presents the following issues for our review:

> 1.    Whether the trial court abused its discretion when it admitted into evidence a videorecording of a child witness's forensic interview regarding the alleged molestations.
>
> 2.    Whether the trial court abused its discretion when it made two other evidentiary rulings.
>
> 3.    Whether the trial court abused its discretion when it struck a remark by defense counsel during closing argument.

We affirm.

# Facts and Procedural History

In 2009, Hershberger and Megan Allen had a one-month-long relationship. Allen became pregnant by Hershberger, and their daughter, C.H., was born on February 25, 2010. Allen had primary custody of C.H., and Hershberger exercised parenting time with C.H. every other weekend.

In 2012, Hershberger began dating Katie Schrock, who had four children, including son E.P., born June 3, 2009, and daughter I.H., born October 2, 2010. Shortly after he and Schrock started dating, Hershberger "signed I.'s birth certificate" as her father. Tr. Vol. 5 at 15. In October 2012, Schrock lost custody of her children, and Hershberger was given full custody of E.P. and

I.H.[1] Hershberger lived with the children at his mother's house in Walkerton. He and the children, including C.H. during visitations, slept in the basement of the house in one room that included three beds.

[5] In July 2013, after visiting with Hershberger, C.H. complained to Allen of pain in her "front butt,"[2] and Allen saw that the area around C.H.'s vagina was red. Tr. Vol. 3 at 62. Allen took C.H. to St. Joseph's Regional Medical Center for a physical examination. There, Allen was instructed to contact the Department of Child Services ("DCS"), and Allen took C.H. to be interviewed at the Casie Center, a child advocacy center. Sally Wisthuff interviewed C.H. and found no indication that C.H. had been molested.

[6] On December 2, 2014, I.H. left Hershberger's house to visit with Schrock, and she told Schrock that her "front butt hurt." Tr. Vol. 5 at 22. Schrock examined I.H.'s vaginal area and saw that it was "completely red down there." *Id.* Accordingly, on December 5, Schrock took I.H. to a local hospital and requested that a rape kit and examination be conducted on I.H. Dr. Steven Spilger examined I.H. and found no indication of molestation. But, given the nature of Schrock's concerns, Dr. Spilger contacted DCS, and Schrock was advised to take I.H. to the Casie Center for an interview.

---

[1] At some point, Schrock began to exercise regular overnight visitation with I.H.

[2] Both C.H. and I.H. refer to their vaginas as their "front butts."

[7] In the course of her interview at the Casie Center, then four-year-old I.H. stated that Hershberger: put a "buzzy thing" in her "front butt"; put his finger in her "front butt"; and put his "dingy"[3] in her mouth, in her "front butt," and in her "back butt." State's Ex. 11. I.H. stated that Hershberger takes his "dingy" out of her mouth "when it drips." *Id.* I.H. explained that Hershberger wiped off "the drips" with a blanket or towel, and she put her underwear and pants back on afterwards. *Id.*

[8] After I.H.'s interview, DCS contacted Allen and advised her to take then-four-year-old C.H. to the Casie Center for another interview. After that interview, Allen took C.H. to a local hospital, where Brittany Troyer, a registered nurse, conducted a sexual assault examination of C.H. Nurse Troyer found that C.H.'s vagina and anus were red and irritated, and she found that C.H.'s anus was slightly dilated. Nurse Troyer concluded that C.H. may have been sexually abused.

[9] On August 24, 2015, the State charged Hershberger with ten counts of child molesting, five as Class A felonies, and five as Level 1 felonies. Seven of the counts related to I.H., two counts related to C.H., and one count related to E.P. Prior to trial, the State dismissed three of the counts related to I.H., as well as the one count related to E.P. Also prior to trial, the State filed its

---

[3] C.H. and I.H. both referred to Hershberger's penis as a "dingy."

notice of its intention to introduce the witness statements [of I.H.] and audio/video recording in evidence should the trial court find that the victim is an unavailable witness, and requests a hearing on the matter. Upon such a finding being made by the Court, the State will request that the Court conduct a hearing outside of the jury's presence to determine the admissibility of her statements and the videotape pursuant to I.C. [§] 35-37-4-6[, the Protected Person Statute].

Appellant's App. Vol. 3 at 70.

[10] On September 12 and October 7, 2016, the trial court conducted a hearing on the State's motion under the Protected Person Statute and granted that motion. On December 12, the trial court conducted a jury trial, during which then-six-year-old C.H. took the stand and testified that Hershberger: put his "dingy" or "front" into her; made her touch his "dingy"; made her put his "dingy" in her mouth; put his "dingy" inside her butt; and put a "buzzy thing" inside her "front part." Tr. Vol. 3 at 175-83. C.H. also testified that she saw Hershberger put his "dingy" in I.'s "back." *Id.* at 186. Finally, C.H. identified two sex toys, including a vibrator, officers found in a drawer in Hershberger's bedroom. C.H. explained that Hershberger used one of the sex toys by placing it "on" his "dingy" and "kind of like move[d] around a little bit."[4] *Id.* at 204-05. I.H. did not testify, but the trial court admitted into evidence the State's Exhibit 11, which is a videorecording of I.H.'s interview at the Casie Center.

---

[4] In addition to a vibrator, officers found a sex toy that appears to have both a fake vagina and a fake anus.

The jury found Hershberger guilty as charged. Accordingly, the trial court entered judgment of conviction for six counts of child molesting, five as Level 1 felonies and one as a Class A felony. The court sentenced Hershberger to an aggregate term of ninety years. This appeal ensued.

## Discussion and Decision

### Issue One: Protected Person Statute

Hershberger first contends that the trial court abused its discretion when it admitted into evidence State's Exhibit 11, the videorecording of I.H.'s interview at the Casie Center. The trial court is afforded wide discretion in ruling on the admissibility of evidence. *Shinnock v. State*, 76 N.E.3d 841, 842 (Ind. 2017). On appeal, evidentiary decisions are reviewed for abuse of discretion and are reversed only when the decision is clearly against the logic and effect of the facts and circumstances. *Id.* at 842-43.

The Protected Person Statute, Indiana Code Section 35-37-4-6 (2017), defines a "protected person" in relevant part as a child under the age of fourteen. The statute provides further in relevant part as follows:

> (d) A statement or videotape that:
>
> > (1) is made by a person who at the time of trial is a protected person;
> >
> > (2) concerns an act that is a material element of an offense listed in subsection (a) or (b) that was allegedly committed against the person; and

(3) is not otherwise admissible in evidence;

is admissible in evidence in a criminal action for an offense listed in subsection (a)[5] or (b) if the requirements of subsection (e) are met.

(e) A statement or videotape described in subsection (d) is admissible in evidence in a criminal action listed in subsection (a) or (b) if, after notice to the defendant of a hearing and of the defendant's right to be present, all of the following conditions are met:

(1) The court finds, in a hearing:

(A) conducted outside the presence of the jury; and

(B) attended by the protected person in person or by using closed circuit television testimony as described in section 8(f) and 8(g) of this chapter;

that *the time, content, and circumstances of the statement or videotape provide sufficient indications of reliability*.

(2) The protected person:

(A) testifies at the trial; or

(B) is found by the court to be unavailable as a witness for one (1) of the following reasons:

---

[5] Subsection (a) includes "sex crimes," which include child molesting. Ind. Code § 35-42-4-3.

(i) From the testimony of a psychiatrist, physician, or psychologist, and other evidence, if any, the court finds that the protected person's testifying in the physical presence of the defendant *will cause the protected person to suffer serious emotional distress such that the protected person cannot reasonably communicate.*

(ii) The protected person cannot participate in the trial for medical reasons.

(iii) The court has determined that the protected person is incapable of understanding the nature and obligation of an oath.

(f) If a protected person is unavailable to testify at the trial for a reason listed in subsection (e)(2)(B), a statement or videotape may be admitted in evidence under this section only if the protected person was available for cross-examination:

(1) at the hearing described in subsection (e)(1); or

(2) when the statement or videotape was made.

*Id.* (emphases added).

Hershberger maintains that the trial court should have excluded State's Exhibit 11 from the evidence because the State made an insufficient showing that I.H. was unavailable to testify at trial and because the interview did not contain sufficient indicia of reliability to render it admissible. We address each contention in turn.

*Availability to Testify*

During the hearing on the State's motion under the Protected Person Statute, Darlene Radcliff, a licensed therapist with a bachelor's degree in psychology and a master's degree in social work, testified that she treated I.H. for post-traumatic stress disorder ("PTSD") from February of 2015 until February or March of 2016. Radcliff testified further that "[I.H.] would, indeed, suffer extreme distress emotionally, if she were required to testify. She did not complete treatment, and she didn't really receive the support that she needed during that time outside of treatment." Tr. Vol. 2 at 88. And this colloquy ensued:

> Q:  Okay. Do you believe that if she is called upon to testify in the trial of Jason Hershberger whether [sic] or not she would be able to reasonably communicate the events?
>
> A:  I believe that it would be very likely that she would not be able to speak or that she would be just unable to engage and may, in fact, disassociate.
>
> Q:  Now, obviously, you were looking into the future based on what you were talking about, but again, disassociate, is that the taking herself out of the position as it were?

A:    Yes.  When confronted with a trigger or a reminder of anything traumatic children can become very overwhelmed in the moment and unable to function, unable to communicate, as they normally would have in other settings where they felt safe.

*Id.* at 88-89.

[16]    Also at the hearing, Dr. Jeff Burnett, a psychologist, testified that he saw I.H. on two occasions in August of 2016.  Dr. Burnett testified that he believed I.H. would "be likely to experience significant emotional distress" if she were to testify at trial.  *Id.* at 128.  But Dr. Burnett did not have a "firm opinion" about I.H.'s ability to "reasonably communicate" if called to testify at trial.  *Id.*

[17]    Hershberger contends that, "[b]ecause I.H. testified at the protected person hearing in front of Mr. Hershberger without suffering apparent distress and Dr. [Burnett] could form no opinion as to whether I.H. would be able to communicate at trial, I.H. was available as a witness for trial."  Appellant's Br. at 21-22.  But that contention ignores Radcliff's testimony that, if called to testify at trial, I.H. would suffer "extreme distress," would likely be unable to speak or engage, and "may . . . disassociate."  Tr. Vol. 2 at 88-89.  We cannot say that the trial court abused its discretion when it found that I.H. was unavailable to testify under the Protected Person Statute.

*Indicia of Reliability*

[18]    Hershberger asserts that I.H.'s forensic interview does not have sufficient indicia of reliability to be admissible under the Protected Person Statute.  First,

Hershberger maintains that, because there is no evidence showing when the alleged molestations occurred other than sometime between April 1, 2012, and December 8, 2014, there is no way to know whether I.H.'s statements to the forensic interviewer on December 8, 2014, were made days, weeks, months, or years after the molestations. Citing our Supreme Court's opinion in *Carpenter v. State*, 786 N.E.2d 696, 703 (Ind. 2003), Hershberger contends that reliability is lacking because "too much time" may have passed between the time of the statement and the alleged molestations. Appellant's Br. at 23. But in *Carpenter*, there was "no evidence *at all* as to when the alleged molestation occurred." 786 N.E.2d at 703 (emphasis added). In contrast, here, I.H. gave her interview at the Casie Center only a few days after leaving Hershberger's house and complaining to Schrock that her "front butt hurt." Tr. Vol. 5 at 22. And Schrock observed that I.H.'s vaginal area was "completely red" at that time. *Id.* Thus, the evidence supports a determination that Hershberger had recently molested I.H. at the time she gave the interview at the Casie Center.

[19] Hershberger also contends that, given that "I.H.'s mother took her in for a 'rape exam' just after getting married also leaves open the risk that the mother may have coached I.H. or attempted to exploit her by fabricating a complaint of sexual assault in an effort to better her chances of regaining custody over I.H." Appellant's Br. at 23. But Hershberger does not support that contention with evidence of coaching or Schrock's ulterior motives, and it is mere speculation.

[20] Finally, Hershberger asserts that "the statement itself shows plainly that it is lacking in reliability" given that I.H. "changed her answers repeatedly and the

interviewer occasionally resorted to suggestive questioning." Appellant's Br. at 23. But, as the State points out, the trial court considered those points and concluded as follows:

> Given the range of dates (from 2012 to 2014) contained in the charging information, I.H.'s December, 2014 interview may have been conducted at a time remote from some of the charged offenses. Nonetheless, it appears that the interview was conducted shortly after I.H.'s initial disclosure to her mother.[] There was little time for coaching the child between the time of her initial disclosure and the interview at the CASIE Center. More significantly, there was no evidence of coaching apparent in the interview. I.H.'s disclosure was not a concise, rehearsed narrative offered by a child eager to talk about abuse. I.H. meandered in her conversation. She became distracted. She led the interviewer through a variety topics before returning to a discussion of the alleged abuse.
>
> Notwithstanding the twists and turns the interview sometimes took, the interviewer seemed to be following a specific protocol as she spoke with I.H. First, Ms. Verduin first built rapport with the child, then she showed I.[H.] pictures of a boy and a girl. Through questioning, Ms. Verduin determined what words I.[H.] used for the parts of the body. The interviewer asked I.[H.] about touches ( e.g. "Are there any parts on the girl's body that nobody should touch?" "Has anybody ever touched you?"). At some point during this inquiry, I.H. disclosed that Jason had touched her "front butt." Ms. Verduin then tried to use open-ended questions as she moved into an inquiry about the abuse. At times Ms. Verduin had to resort to asking closed questions. These direct questions did not, however, suggest specific answers.[] In light of I.H.'s age at the time of the interview, the Court does not find that the interviewer's use of direct questions made the child's statement unreliable.

Ultimately the most persuasive evidence of reliability came from the words I.H. used and the details she provided. She told her story in fragments, in a young child's way, using a young child's words. Threaded through her disclosure were idiosyncratic descriptions of what she claimed had happened: She described what was apparently a sexual device as a "buzzy" thing; she described the "drip" of ejaculate; and she repeatedly reminded her interviewer that there were things that were not to be discussed. These idiosyncratic details, details that were relayed in the developmentally appropriate vocabulary of the child, have led the Court to conclude that I.H.'s statements were reliable.

Appellant's App. Vol. 2 at 225-27.

[21] We agree with the trial court's conclusion that I.H.'s interview contains sufficient indicia of reliability to be admissible under the Protected Person Statute. To the extent Hershberger avers that I.H.'s occasional nonsensical responses render the entire interview unreliable, the trial court disagreed, and the court's reasoning is sound. We hold that the trial court did not abuse its discretion when it admitted into evidence the videorecorded interview I.H. gave at the Casie Center.

### Issue Two: Other Evidentiary Rulings

[22] Hershberger also contends that the trial court abused its discretion when it admitted into evidence two photographs of a sex toy officers found in his bedroom and when it prohibited him from testifying to a statement he had previously made to I.H. We address each contention in turn. Again, we review the trial court's evidentiary rulings for an abuse of discretion. *See Shinnock*, 76 N.E.3d at 842.

*Photographs*

[23] Hershberger maintains that the trial court abused its discretion when it admitted, over his objections, two photographs of a sex toy. State's Exhibit 10 is a photograph showing a sex toy and a vibrator lying in a drawer among clothing. State's Exhibit 21 is a photograph showing the underside of the sex toy revealing two holes that appear to serve as a fake vagina and a fake anus. The depiction of the sex toy in Exhibit 10 does not show the holes, as the holes are facing down in that photograph. Only Exhibit 21 shows the two holes in the sex toy. Hershberger asserts that the trial court abused its discretion when it admitted the photographs because they are not relevant and because any relevance is outweighed by the risk of unfair prejudice. We cannot agree.

[24] As the State correctly points out, the photographs of the sex toy corroborate C.H.'s testimony that she saw Hershberger place the sex toy "on" his "dingy" and "kind of like move around a little bit." Tr. Vol. 3 at 204-05. And the photographs depict different things—Exhibit 10 shows where and how the sex toy was stored in a drawer in the bedroom, and Exhibit 21 shows the two holes in the bottom of the sex toy. The photographs are highly relevant in that a typical six-year-old child would be unfamiliar with such a device absent the exposure to it she described, and that relevance is not substantially outweighed by prejudice to Hershberger. We hold that the trial court did not abuse its discretion when it admitted into evidence State's Exhibits 10 and 21.

*Hearsay*

[25] Hershberger frames his contention on this issue as follows:

In an effort to explain how the children became familiar with and adopted the term "buzzy thing," Mr. Hershberger's counsel attempted to ask him questions during his testimony about things he said to I.H. on an occasion where he discovered her in possession of the vibrator. In sustaining the State's objection the trial court correctly defined hearsay when it ruled "It's an out of court statement offered for the truth of the matter asserted therein. I don't think there's an exception for whether it's what you said. I'm sustaining the objection." While this explanation is factually correct, it overlooks the fact that "[a]ny statement not offered for purposes of proving the facts asserted therein simply [are] not hearsay, and therefore cannot be subject to any hearsay exception." *Byrd v. State*, 579 N.E.2d 457, 463 (Ind. Ct. App. 1991) (citing *Ballard's Estate v. Ballard*, 434 N.E.2d 136 (Ind. Ct. App. 1982)).

The intended purpose of Mr. Hershberger's testimony was to explain an alternative theory as to how the children became familiar with the vibrator that he was accused of using during acts of child molestation. His testimony concerning his own out of court statements was not being offered for the purpose of proving the facts asserted in those out of court statements, but rather to show the origins of the term "buzzy thing."

Appellant's Br. at 16.

[26] As the State correctly points out, Hershberger made no argument to the trial court that the proffered statement was not hearsay because it was not being offered to prove the truth of the matter asserted. *See* Evid. R. 801(c)(2). He

makes this contention for the first time on appeal, and it is, therefore, waived.[6] *Davis v. State*, 74 N.E.3d 1215, 1220 (Ind. Ct. App. 2017).

### *Issue Three: Closing Argument*

[27]     Finally, Hershberger contends that the trial court abused its discretion when, during closing argument, it sustained the State's objection when his defense counsel "started to talk about the significance of the fact that DNA from a male, other than Mr. Hershberger, was discovered on C.H.'s underwear." Appellant's Br. at 17.  The proper scope of closing argument is within the trial court's sound discretion. *Walls v. State*, 993 N.E.2d 262, 269 (Ind. Ct. App. 2013), *trans. denied*.  We will not find that the trial court abused its discretion unless its decision is clearly against the logic and effect of the facts and circumstances before it.  *Id.*

[28]     During his closing argument, defense counsel stated as follows:

> However, they did find an unknown male's DNA on [C.H.'s] underwear.  On her underwear.  And that's something that we didn't hear anything in the State's argument about, well, that's really not something we want to talk about.  *Some other person who might have done this* or . . .

---

[6] Hershberger makes no contention on appeal that the proffered statements were not hearsay under Indiana Evidence Rule 801(d).

Tr. Vol. 6 at 105 (emphasis added). The State interrupted defense counsel and asked to approach the bench, and the following colloquy transpired during a side bar conference:

[State]: That's certainly not a fact in evidence, and if he was, at this point, going to argue to the jury that there is someone else who could have molested this child, there should have been a notice that was filed and evidence presented to that effect.

[Court]: Response?

[Defense counsel]: *All I'm talking about is the test result, which she put into evidence.* I think I'm able to make—

[Court]: I don't think you can argue inferences this child was molested, without running [afoul of] [Evidence Rule] 412. You can argue that the State didn't say anything about it.

[Defense counsel]: All right.

[Court]: And kind of what you've done so far. There's just, you know, lurking out there [sic], and they never addressed it. But I don't think you can do anything, going to that someone else was [the] molester.

[State]: I would ask for an admonishment to the jury not to consider that someone else might have done this.

[Court]: I don't think he got that far to suggesting someone else.

[State]: That's what he started to say.

[Court]: I'm sorry. I didn't write it down totally. What specifically had you just last said?

[Defense counsel]:  I can't remember.  I'm sorry.

[State]:        I believe he specifically said that someone else . . .

                            * * *

[State]:        Someone else may have done this to this child.

[Court]:        All right.  I will admonish them.

*Id.* at 105-06 (emphasis added).  The trial court then admonished the jurors as follows:  "You are admonished and directed to ignore and not consider in any way [defense counsel's] last statement."  *Id.* at 106.  Defense counsel then requested another side bar conference, and this colloquy ensued:

[Defense counsel]:  I think they are able to.  *I think they should be able to consider the fact that there's some other male's DNA on there*.

[Court]:        Okay.  Regarding someone.

[Defense counsel]:  Right.

[Court]:        I just said, the last statement.  I don't think you want me to say, again, regarding whether someone else molested her.  But I will be happy to say that.

[Defense counsel]:  Okay.

[Court]:        I just thought it would be better.

[Defense counsel]:  Yeah.  Yeah.  Okay.

*Id.* at 107 (emphasis added). Then the trial court stated: "You are admonished to ignore [defense counsel's] statement suggesting or calling into question whether anyone else might have molested C.[H.] *Id.*

[29] On appeal, in a footnote, Hershberger points out that Evidence Rule 412(b)(1)(A) explicitly *permits* "evidence of specific instances of a victim's or witness's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence." And this court has observed that Evidence Rule 412(b)(1)(A) "contemplates that if the State" presents evidence of DNA belonging to an unknown male to the jury, a defendant is then "allowed to present evidence showing that the DNA came from someone else." *Pribie v. State*, 46 N.E.3d 1241, 1248 (Ind. Ct. App. 2015), *trans. denied*. Thus, Hershberger would have been permitted to present evidence that someone other than him molested C.H.

[30] But Hershberger made no attempt to present evidence that someone else molested C.H. And, during closing argument, in response to the State's objection, defense counsel argued only that the jury "should be able to consider the fact that there's some other male's DNA on there." Tr. Vol. 6 at 107. Defense counsel did not argue that he should have been able to make an inference based on that evidence that someone other than Hershberger molested C.H. The trial court explicitly permitted defense counsel to comment on the evidence that an unknown male's DNA was found on C.H.'s underwear. For the first time on appeal, Hershberger asserts that the trial court should have permitted his defense counsel to "make an argument . . . that someone other

than Mr. Hershberger may have been responsible for the molestation of these young children." Appellant's Br. at 18. Hershberger has waived this issue on appeal. *Davis*, 74 N.E.3d at 1220.

## *Conclusion*

The trial court did not abuse its discretion when it admitted into evidence the videorecording of I.H.'s interview at the Casie Center under the Protected Person Statute. The trial court did not abuse its discretion when it admitted into evidence two photographs of a sex toy, State's Exhibits 10 and 21. And Hershberger has waived for our review his contentions that the trial court abused its discretion both when it excluded hearsay testimony and when it restricted defense counsel's closing argument. Accordingly, we affirm Hershberger's convictions.

Affirmed.

Kirsch, J., and Brown, J., concur.